## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BRANDON MORRIS,

     Plaintiff,

v.                              Case No.: 21-cv-02280

CITY OF LAKELAND, FLORIDA;
JEREMY WILLIAMS; and
ALEXANDER COOKS,

     Defendants.

_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, CITY OF LAKELAND, FLORIDA ("the City"); JEREMY WILLIAMS; and ALEXANDER COOKS (collectively, "the Officers"), by and through their undersigned counsel and pursuant to Federal Rule of Civil Procedure 56, hereby move this Court to grant summary judgment in Defendants' favor on all claims of Plaintiff's, BRANDON MORRIS, First Amended Complaint (Doc. 24). No genuine issue of material fact exists in the record, and Defendants are entitled to judgment in their favor as a matter of law on each count of the First Amended Complaint. In support of this Motion, Defendants provide the following Memorandum of Law:

## STATEMENT OF MATERIAL FACTS

1.    The relevant events took place in the early morning on October 27, 2017, at 1732 Olive Street in Lakeland, Florida (the "Premises"). (Ex. 1 at 01:27:50-

01:54:51).[1] The Premises is both a residence and an ice cream shop, in which Plaintiff and his sister, Brianna Morris ("Brianna"), resided, with a warehouse in the back of the building. (Ex. 2 at 9:8-9; Ex. 3 at 11:10-12:12, 14:24-15:8). Brianna described the surrounding area as "a very bad part of the area" where she "wouldn't walk around … at night." (Ex. 2 at 9:12-13, 11:22-13:5; *see also* Ex. 3 at 12:19-14:19).

2.      At around 1:25 a.m., Brianna was upstairs with her dog and was on a phone call with her brother the Plaintiff when she heard a noise coming from the warehouse which frightened her. (Ex. 2 at 9:9-17, 13:9-14:12, 30:1-16; *see also* Ex. 3 at 23:16-24:13). Brianna told Plaintiff that she heard a noise in the warehouse and asked if he was there. (Ex. 2 at 9:15-16; Ex. 3 at 23:22-24:2). Plaintiff then decided to play a prank on his sister and told her that he was not home.  (Ex. 2 at 9:17, 24:17-25:20; Ex. 3 at 23:22-24:2).

3.      Brianna hung up, quickly grabbed her dog, and ran outside through the front door to call 911 on her cell phone, which connected with the Lakeland Police Department ("LPD"). (Ex. 2 at 9:18-24, 15:6-16:6, 24:9-16; Ex. 1 at 1:27:50). Brianna reported that she heard somebody in the place she was staying in, that it was an ice company, that she heard somebody in the warehouse, and that she was not sure what it was. (Ex. 2 at 14:13-22; Ex. 1 at 01:28:43, 01:29:25: 01:30:23). The call cut short, however, as Brianna's phone ran out of power. (Ex. 2 at 9:20-21, 17:20-18:3, 30:17-22; Ex. 1 at 01:29:30, 01:30:45, 01:32:03-11).

---

[1] The relevant codes from the log are as follows: "206" is Williams; "325" is Cooks; "193" is Officer Colton Thompson; and "1015" is "prisoner in custody." (Ex. 6 ¶ 14).

4.      Accordingly, at 1:29 a.m., LPD accordingly dispatched several officers to the scene, including *inter alia* Williams, Cooks, and Officer Colton Thompson, on a report of burglary of a business. Ex. 1 at 01:29:15, 1:30:42, 1:32:00, 1:35:07, 1:38:15-1:39:57. LPD Dispatch informed the officers that there was a burglary in progress, that the caller had heard somebody in the back of the warehouse area of the business, had left the business, and had run down the road. (Ex. 4 at 116:4-21; *see* also Ex. 4 at 26:24-27:12, 28:9-30:6, 87:1-15, 116:4-15; Ex. 5 at 13:19-23, 73:23-74:3; Ex. 6 ¶ 5).

5.      Officer Thompson arrived on scene at around 1:35 a.m. and met up with Brianna outside about two buildings south from the business. (Ex. 6 ¶ 7; Ex. 1 at 01:33:41-01:34:26; Ex. 2 at 16:7-19). There, Brianna stated that she was sleeping inside the business; that she heard someone attempting to break into the south entrance of the building, but did not see who it was; that nobody else was supposed to be in the business at the time except for her; that she became afraid; that she exited through the north door and called 911; and that she heard someone enter the building as she was leaving. (Ex. 6 ¶ 7). Officer Thompson relayed the same to the other responding officers over the radio. (Ex. 6 ¶ 8).

6.      Cooks arrived on scene at approximately 1:32 a.m. Ex. 1 at 1:32:00. Williams was a K-9 officer and responded on scene with a trained K-9 named "Hyde" at 1:38 a.m. (Ex. 4 at 11:23-12:2; 12:14-13:14, 14:2-15:7; Ex. 1 at 1:38:29).

7.      Officers Cooks and Williams, along with Hyde, approached the front door of the business, saw that the north (front) gate was open, and found the front

door locked. (Ex. 1 at 1:35:21, 1:43:51; Ex. 5 at 23:17-26:9; Ex. 4 at 47:13-48:3; Ex.6 ¶ 9; *see also*, Ex. 2 at 18:20-25). The Officers announced themselves as police and issued a verbal order to open the door. (Ex. 6 ¶ 10; Ex. 2 at 18:14-18; Ex. 5 at 30:8-13, 43:21-44:3). At 1:43 a.m., Cooks saw somebody sneaking around inside the building through a frosted glass window left of the front door. (Ex. 5 at 34:23-25, 74:12-18; Ex. 1 at 1:43:48).

8.     Soon thereafter, Plaintiff unlocked the door and opened it. (Ex. 3 at 25:17-19, 29:7-17; Ex. 4 at 48:22-49:1; Ex. 5 at 26:4-6, 74:4-8; Ex. 2 at 22:5-10). Williams gave Plaintiff verbal commands to "Stop. Let me see your hands." (Ex. 4 at 49:2-6). Plaintiff did not obey those commands, and instead started shutting[2] the door on the officers. (Ex. 4 at 36:16-18, 37:16-38:11, 110:17-111:5; Ex. 5 at 30:14-17, 32:18-33:23, 47:20-48:8, 75:1-4; Ex. 3 at 30:9-23). At that time, Williams believed that Plaintiff was a burglar trying to escape. (Ex. 4 at 101:20-102:1). Williams kicked the door open and then released Hyde. (Ex. 4 at 37:16-38:11; Ex. 5 at 33:24-34:3; Ex. 3 at 31:13-20, 32:17-21). Hyde proceeded into the business and then bit and held Plaintiff's left thigh, causing Plaintiff to fall to the floor. (Ex. 3 at 32:22-33:13; Ex. 4 at 39:11-13).

9.     Before Plaintiff opened the door, he was aware of the police's presence outside of the front door. (Ex. 3 at 25:22-26:11, 29:3-6).

---

[2] While there is some dispute as to how far Plaintiff shut the door or whether Plaintiff shut the door completely, that fact is ultimately immaterial. The only relevant fact here is that Plaintiff attempted to shut the door on law enforcement who were issuing lawful commands to "Stop. Let me see your hands," and enter.

10.     Williams and Cooks then attempted to handcuff Plaintiff. (*See, e.g.*, Ex. 4 at 83:1-5). Williams repeatedly ordered Plaintiff to "let me see your hands," and multiple officers were giving loud verbal commands to stop resisting. (Ex. 6 ¶ 11; *see also* Ex. 4 at 115:2-6). Plaintiff did not put his hands behind his back when ordered to do so, and instead tensed up his arms and placed his hands on the dog. (Ex. 4 at 63:19-25, 66:21-67:6, 67:17-23, 95:23-98:16, 114:22-115:6, 115:14-23; Ex. 5 at 40:15-41:2, 41:13-23, 44:6-11, 47:16-19, 48:14-21). During the handcuffing, Cooks struck Plaintiff twice in the side of the torso with his flashlight in order to obtain compliance. (Ex. 5 at 51:17-53:3).

11.     Williams and Cooks eventually handcuffed Plaintiff and Williams placed Plaintiff under arrest for resisting an officer without violence. (Ex. 4 at 91:20-92:4, 114:14-17). After Plaintiff was handcuffed, Williams immediately ordered Hyde to release, which he did. (Ex. 4 at 6:7-21, 8:5-11, 9:17-11:22, 84:4-21; Ex. 3 at 34:22-24, 40:15-18, 41:7-9). The entire encounter lasted at most two minutes, as Williams reported that Plaintiff was in custody at 1:45 a.m. Ex. 1 at 1:43:48-1:45:56.

12.     At 1:54, Plaintiff was transported to Lakeland Regional Health. (Ex. 1 at 1:54:51; Ex. 5 at 55:22-57:17; Ex. 3 at 44:8-10). The dog bite did not require surgery or stitches, and any scarring on Plaintiff's thigh is scarcely visible. (Ex. 3 at 38:17-23, at Exhibit 4). The facial abrasion was not a serious injury, nor did Plaintiff receive any notable treatment for it. (Ex. 3 at 37:14-16, 58:6-10, 59:12-22, at Exhibit 5).

13.     Unbeknownst to Brianna or the responding officers until after the arrest, Plaintiff was the one who caused the noise in the warehouse, and had lied on the phone about his location to try to play a prank on Brianna. (Ex. 3 at 28:5-8; *see also* Ex. 4 at 89:7-14).

14.     Plaintiff subsequently brought this suit, alleging the following causes of action: (I) common law battery and false arrest against the City; (II) 42 U.S.C. § 1983 claim for violation of the Fourth Amendment against Williams; and (III) 42 U.S.C. § 1983 claim for violation of the Fourth Amendment against Cooks. (Doc. 24). Defendants now timely move for summary judgment. (*See* Doc. 31 at 1).

## LEGAL STANDARD

Summary judgment is appropriate when there are no genuine issues as to any material fact when the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 656 (11th Cir. 1983). After the movant successfully discharges their initial burden of showing the lack of material issues of fact, the burden shifts to the nonmovant to establish, with evidence beyond the pleadings, that there is an issue material to the nonmovant's case. *Celotex Corp.*, 477 U.S. at 324. "A court may grant summary judgment if it determines that the evidence, viewed most favorable to the plaintiff, shows that force was reasonable under the circumstances surrounding the arrest." *Cornett v. City of Lakeland*, No. 8:06-cv-2386, 2008 U.S. Dist. LEXIS 52595 at *12 (M.D. Fla. July 10, 2008) (citing *Samarco v. Neumann*, 44 F.Supp.2d 1276, 1284 (S.D. Fla. 1999)). The reasonableness of the circumstances depends on many factors,

including *inter alia* "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The nonmovant must present "affirmative evidence" of material factual conflicts to defeat a motion for summary judgment that is properly supported. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 257 (1986).

Regarding summary judgment on the particular ground of qualified immunity, the U.S. Supreme Court has cautioned that "deny[ing] summary judgment any time a material issue of fact remains on the excessive force claim … could undermine the goal of qualified immunity to 'avoid excessive disruptions of government and permit the resolution of many insubstantial claims on summary judgment.'" *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)), overruled on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009).

## ARGUMENT

Defendants move for summary judgment on three grounds: (I) there is no genuine dispute of material fact that, under the circumstances of this case, neither of the Officers violated Plaintiff's Fourth Amendment rights; (II) even if there were such a dispute, the Officers are entitled to qualified immunity; and (III) the City is not liable for common law battery or false arrest. Defendants address each in turn.

## I.   Neither Williams nor Cooks Violated a Clearly Established, Constitutionally Protected Right of Plaintiff (Counts II, III)

Plaintiff alleges two grounds that Williams and Cooks violated his rights under the Fourth Amendment to the United States Constitution. First, Plaintiff alleges that Williams falsely arrested Plaintiff "without arguable probable cause." (Doc. 24 ¶ 43). Second, Plaintiff alleges that Williams and Cooks "personally inflicted excessive force" on Plaintiff, and that Williams also did so "through the means of a police dog." (Doc. 24 ¶¶ 44, 48). Neither argument has merit.

### a.   Williams Is Not Liable for False Arrest Because He Had Probable Cause to Arrest Plaintiff (Count II)

To prevail on a claim for false arrest pursuant to the Fourth Amendment, a plaintiff must establish "(1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process." *Williams v. Aguirre*, 965 F.3d 1147, 1165 (11th Cir. July 13, 2020). "The existence of probable cause at the time of arrest, however, constitutes an absolute bar to a section 1983 action for false arrest." *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004). Probable cause exists where "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* at 1226 (quoting *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995)).

The ultimate question is whether Williams had probable cause to arrest Plaintiff for either burglary[3] or resisting an officer without violence. As discussed below, the question resolves in the affirmative as to both offences.

### i. Burglary

The Officers were responding to a reported burglary, which crime is governed by § 810.02, Florida Statutes. The then-applicable version of § 810.02, Florida Statutes, set forth the elements of second degree felony burglary, in relevant part, as follows: (1) "entering a dwelling, a structure, or a conveyance;" (2) "with the intent to commit an offense therein;" (3) "in the course of committing the offense the offender does not make an assault or battery and is not and does not become armed with a dangerous weapon or explosive" and (4) at the time the offender enters or remains, "there is another person in the dwelling [or structure]" or "there is not another person in the dwelling."

Williams clearly had probable cause to arrest Plaintiff for second degree felony burglary. Brianna reported that she heard somebody in the building she was staying in, that she heard somebody in the warehouse, and that she was not sure what it was. Dispatch made this information aware to the Officers and classified

---

[3] While Williams did not arrest Plaintiff specifically for burglary, probable cause for crimes other than the ultimately-charged crime will justify the arrest and preclude a false arrest action. *Harvey v. City of Stuart*, 296 Fed. Appx. 824, 828-29 (11th Cir. 2008) (false arrest claim is barred if any one of the possible charges were supported by probable cause); *Bailey v. Board of Cty. Comm'rs*, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992) ("The validity of an arrest does not turn on the offense announced by the officer at the time of the arrest.").

the report as a burglary in progress. Furthermore, Plaintiff's conduct upon encountering the officers reinforces that probable cause. The Officers approached the front door of the Premises, announced their presence, and issued verbal orders. Cooks looked through a frosted window next to the door and saw someone "sneaking around" inside. A young man (Plaintiff) opened the door and, seeing the uniformed Officers, immediately tried to close the door. In these circumstances, a prudent in those circumstances could reasonably conclude that the man was a burglar who, in a panic from seeing law enforcement officers at the door, attempted to evade arrest by closing the door on the officers, as Williams in fact believed at the time. (Ex. 4 at 101:20-102:1). Under either the dwelling standard or the structure standard of § 810.02(3), the facts that Brianna relayed to Dispatch and which were relayed to the officers, as well as the Officers' observations of Plaintiff's conduct at the scene, clearly show probable cause for burglary under the statute.

Having shown that Williams had probable cause, to arrest Plaintiff for felony burglary, Plaintiff cannot have suffered false arrest as a matter of law. Accordingly, summary judgment is due in Williams's favor as to the false arrest claim.

### ii. Resisting an Officer Without Violence

Plaintiff was ultimately arrested for the offence of resisting an officer without violence, pursuant to § 843.02, Florida Statutes (2017), which provides in relevant part:

> Whoever shall resist, obstruct, or oppose any officer ... in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree....

Put another way, a person violates § 843.02 when he (1) resists, obstructs, or opposes an officer; (2) the officer is in the lawful execution of legal process or any legal duty; and (3) the person does not offer or do violence to the officer's person. Each of these elements is satisfied in this case, and Williams clearly had probable cause to arrest for resisting an officer without violence.

The second element of the officer executing a legal duty is easily satisfied here. The Officers were in the process of responding to and investigating a reported burglary at the Premises, which constitutes execution of a legal duty. *See Bassett v. State*, 941 So.2d 440-41 (Fla. 4th DCA 2006); *In Interest of J.B.*, 621 So.2d 489, 490-91 (Fla. 4th DCA 1993). The third element of non-violence is also easily satisfied, as Plaintiff did not attack the Officers or use violence against their person.

As to the first element of resistance, obstruction, or opposition, Williams noted two instances of resistance: (1) Plaintiff disobeying his verbal orders and instead shutting the door in the Officers' faces; and (2) resisting the Officers attempts to handcuff him. (Ex. 4 at 95:15-97:9, 110:17-111:5; 114:16-115:23). First, both Florida and foreign federal courts have found that, when a person closes a door on an officer conducting a lawful investigation, that person is now actively obstructing the officer or resisting arrest. *Bassett*, 941 So.2d 439 (affirming conviction for resisting arrest without violence where defendant opened door at

first but slammed door shut as officer attempted to enter); *In Interest of J.B.*, 621 So.2d 489 (affirming conviction for resisting arrest without violence where defendant slammed door shut, locked it, and refused to open it in front of officer); *see also Price v. Wiese*, No. 16-cv-1174 2020 U.S. Dist. LEXIS 40451 at *18 (S.D. Cal. Mar. 6, 2020) (regardless of plaintiff's stated fear of being bitten, plaintiff was actively resisting arrest where he held bathroom door shut and prevented officers with K-9 from entering). The reasons for this are obvious and myriad. A person is physically obstructing an officer from moving into an area as part of his lawful duty to investigate a reported crime. That person could be attempting to flee, to obtain a conventional or non-conventional weapon from inside the building, to secure an ambushing position, or to attack the investigating officer through the obstruction, among other reasons. (*See* Ex. 7 at 5-6; Ex. 4 at 111:6-112:3); *Nicholes v. Jano*, No. 8:18-cv-774, 2020 U.S. Dist. LEXIS 90340 at *8 (M.D. Fla. May 22, 2020) (use of K-9 was not excessive force where suspect did not overtly surrender himself and a reasonable officer could have been concerned about being met by a potential ambush). Additionally, "[h]ad law enforcement left without completing its investigation, and a tragedy occurred inside the house, surely law enforcement would have been faulted for not taking sufficient precaution...." *Bassett*, 941 So.2d at 441. Thus it is clear that Plaintiff shutting the door in the Officers' faces constituted resistance, obstruction, or opposition of the burglary investigation.

Second, Plaintiff resisted arrest during the handcuffing. As a matter of law, "failing to present one's hands for handcuffing is sufficient evidence to establish

probable cause for the charge of resisting arrest without violence." *Williams v. City of Daytona Beach*, No. 6:04-cv-1879, 2006 U.S. Dist. LEXIS 5766 at *36 (M.D. Fla. Feb. 15, 2006) (citing *Savage v. State*, 494 So.2d 274, 277 (Fla. 2d DCA 1986)). Here, Plaintiff resisted arrest by failing to put his hands behind his back when lawfully ordered to do so and by instead placing his hands on Hyde.

Having shown that Williams had probable cause to arrest Plaintiff on each element of resisting an officer without violence, Plaintiff cannot have suffered false arrest as a matter of law. Accordingly, summary judgment is due in Williams's favor as to the false arrest claim.

### b. Neither Officer Used Excessive Force

Plaintiff alleges that each of Williams and Cooks violated Plaintiff's right to be free from the use of excessive force as guaranteed by the Fourth Amendment to the United States Constitution. (Doc. 24 ¶¶ 44, 48). In particular, Plaintiff alleges that the Officers individually used excessive force when they "jumped on Morris and delivered numerous strikes to Morris's face, body and back of his head" (Doc. 24 ¶ 22; *see also* Ex. 3 at 58:1-18); and further alleges that Williams in particular used excessive force through his police dog, Hyde, which subdued Plaintiff by biting into his left leg. (Doc. 24 ¶¶ 20-21; *see also* Ex. 3 at 58:1-18).

To prove a Fourth Amendment violation based on excessive use of force, a plaintiff must prove "(1) that a seizure occurred, and (2) that the force used to effect the seizure was unreasonable." *Troupe v. Sarasota Cty.*, 419 F.3d 1160, 1166 (11th Cir. 2005). To determine whether the force used was reasonable or not, courts

balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). The reasonableness of the circumstances depends on many factors, including *inter alia* "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

As explained below, there is either no support in the summary judgment record for these allegations or, when properly viewed from the Officers' perspective, the degree of force used was appropriate, proportional, and non-excessive in the circumstances.

### i. Williams's Use of K-9 Force Was Lawful

"The use of police canines to apprehend suspects is not excessive force *per se*." *Cornett*, 2008 U.S. Dist. LEXIS 52595 at *12 (citing *Samarco v. Neumann*, 44 F.Supp.2d 1276, 1284 (S.D. Fla. 1999)). Here, Williams's use of the K-9 was lawful in the circumstances. Using a K-9 to apprehend a burglary suspect by biting him is consistent with generally accepted police policies, practices, and training. (*See* Ex. 7 at 6). As explained above in Section I.a.ii. of this Motion, the use of K-9 is justified given concerns that the suspected felon could be attempting to flee, to obtain a conventional or non-conventional weapon from inside the building, to secure an ambushing position, or to attack the investigating officer through the obstruction, among other reasons. (*See* Ex. 7 at 5-6; Ex. 4 at 111:6-112:3); *Nicholes*, 2020 U.S.

Dist. LEXIS 90340 at *8 (use of K-9 was not excessive force where suspect did not overtly surrender himself and a reasonable officer could have been concerned about being met by a potential ambush).

Not only does the above-cited case law and expert testimony affirmatively show that Williams's use of the K-9 was lawful, but also there no case law showing that Williams had fair notice that Plaintiff had a clearly established right to be free from the K-9 in these circumstances. This case is not identical to any of the seminal K-9 excessive force cases in this Circuit, namely *Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000); *Crenshaw v. Lister*, 556 F.3d 1283 (11th Cir. 2009); and *Jones v. Fransen*, 857 F.3d 843 (11th Cir. 2017). *See Nicholes*, 2020 U.S. Dist. LEXIS 90340 at *8-9. The only of those cases which found the use of a K-9 to be excessive force, *Priester*, is factually distinguishable. Therein, plaintiff was found in a canal outdoors, had already overtly surrendered himself to the K-9 officer, and followed the K-9 officer's orders to lie on the ground, after which the officer unleashed the dog on the plaintiff. 208 F.3d at 923. In the instant case, Plaintiff was in the very building he was suspected of burglarizing, retreated further inside, did not follow the Officers' lawful orders, and instead tried to shut the door. The circumstances are simply inapposite, therefore *Priester* does not serve as fair notice of a clearly established right to be free from the K-9 force used here. Both *Crenshaw* and *Jones* are also factually distinguishable from the instant case, and furthermore cannot show fair notice because each found the subject officers

entitled to qualified immunity regarding the use of K-9 force. 556 F.3d at 1293; 857 F.3d at 855.

Here, even viewing the record in the light most favorable to Plaintiff, neither Williams nor Cooks violated any clearly established, constitutionally protected right of Plaintiff, nor do the seminal 11th Circuit cases provide fair notice that the Officers' conduct constituted such a violation. Accordingly, Williams's use of the K-9 was lawful in the circumstances.

### ii.  All Uses of Force and Injuries Were *De Minimis*

As a preliminary matter, there is no record evidence that Williams struck Plaintiff. Plaintiff testified that someone struck him in the face or head, but does not recall who and only assumes it to be Williams (Ex. 3 at 31:22-32:14, 35:14-36:8); whereas Williams testified with certainty that he never struck Plaintiff (Ex. 4 at 67:10-68:7). The only evidence of any strikes or punches comes from Cooks himself, who testified that he struck Plaintiff twice in the side of the torso with a flashlight. (Ex. 5 at 51:17-53:3). Regardless, whether either of the Officers actually struck Plaintiff's head or not, none of the strikes Plaintiff received constitute excessive force because they were at most *de minimis*.

A typical arrest naturally involves some force or injury, so "a minimal amount of force and injury ... will not defeat an officer's qualified immunity in an excessive force case." *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000).  "[T]he application of *de minimis* force, without more, will not support a claim of excessive force in violation of the Fourth Amendment." *Id.* at 1257. Use of force is *de minimis*

where "the facts show a minimal amount of force combined with a minor or nonexistent injury." *Id.* at 1257 n.3.

Here, the *de minimis* nature of the alleged force is apparent by reference to binding case law where uses of force was found *de minimis* in situations far more severe than the instant case. In *Jones v. City of Dothan*, the Eleventh Circuit found *de minimis* use of force where the arresting officer allegedly "'slammed' [the arrestee] against a wall, kicked his legs apart, required him to put his arms above his head, and pulled his wallet from his pants pocket," thereby tearing his pants and scatting the contents of his wallet on the ground. 121 F.3d 1456, 1458 (11th Cir. 1997). In *Nolin v. Isbell*, the Eleventh Circuit found *de minimis* use of force where the arresting officer allegedly "grabbed [the arrestee] from behind by the shoulder and writ, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his ground in an uncomfortable manner, and handcuffed him." 207 F.3d at 1255; *see also Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559-60 (11th Cir. 1993) (pushing unresisting arrestee against wall and instituting chokehold during handcuffing was *de minimis*). As a final example, in the recent case of *Williams v. City of Montgomery*, the Eleventh Circuit found *de minimis* force where the arresting officers allegedly "us[ed] their body weight to restrict [the arrestee's] movements until they could apply handcuffs … chok[ed] [the arrestee] even as [he] told them that [he] could not breathe and … kneed [the arrestee] in the head … as [he] was being placed in the police vehicle for transport." 839 Fed. Appx. 356, 362 (11th Cir. 2020). The

alleged strikes to Plaintiff's head in the instant case pale in comparison to uses of force which the Eleventh Circuit has found *de minimis*; accordingly, it necessarily follows that the instant strikes too are a *de minimis* use of force.

Next, the *de minimis* nature of Plaintiff's injuries is evident not only from photographs of the same but also from Plaintiff's own testimony. The only notable injury to Plaintiff's head is at most an abrasion on Plaintiff's left cheek, for which there is no evidence of medical treatment. (Ex. 3 at 59:12-22, at Exhibit 5). Furthermore, Plaintiff has admitted that none of the alleged punches resulted in any sort of serious injury. (Ex. 3 at 37:14-16, 58:6-10). There is simply no dispute that the head injury is *de minimis*. As for the dog bite to Plaintiff's left thigh, it too was a *de minimis* injury as it did not require surgery or stitches. (Ex. 3 at 38:17-23). Furthermore, any scarring on Plaintiff's thigh is almost invisible. (Ex. 3 at Exhibit 5).

Furthermore, comparison to other cases with more severe facts shows that physical strikes to Plaintiff's torso cannot be excessive force. As a representative example, this Court recently found in *Leach v. Hoffman*, that an officer's use of a taser against suspect who was physically resisting arrest on the ground was not excessive force. No. 8:19-cv-330, 2022 U.S. Dist. LEXIS 55715 at *9, 25 (M.D. Fla. Mar. 28, 2022). Here, the use of two strikes to Plaintiff's torso is inarguably less severe force than the taser used in *Leach*, and therefore Cooks's strikes to Plaintiff's torso cannot be excessive force.

Accordingly, both the alleged strikes themselves and the claimed injuries were both *de minimis*, and thus Officers did not use excessive force during Plaintiff's arrest. Plaintiff cannot prevail on his excessive force claims regarding the same, and thus summary judgment is due in the Officers' favor on the same.

## II.   Williams and Cooks are Entitled to Qualified Immunity on the False Arrest and Excessive Force Claims (Counts II, III)

Qualified immunity shields a government official from liability unless "the official's conduct 'was so far beyond the hazy border between excessive and acceptable force [that every objectively reasonable officer] had to know he was violating the Constitution even without caselaw on point.'" *Priester*, 208 F.3d at 926 (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)); *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010). "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1280 (11th Cir. 2002) (internal citations omitted); *Santana v. Miami-Dade Cty.*, 688 Fed. Appx. 763, 772 (11th Cir. 2017); *Terrell v. Smith*, 668 F.3d at 1255 (11th Cir. 2012); *Young v. Borders*, 2014 U.S. Dist. LEXIS 195154, at *58 (M.D. Fla. 2014). In considering the circumstances, courts "must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where

inaction could prove fatal." *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1334 (11th Cir. 2004) (citing *Graham*, 490 U.S. at 396-97). Furthermore, "the only perspective that counts [in determining if an officer used excessive force] is that of a reasonable officer on the scene at the time the events unfolded." *Gutierrez*, 627 F.3d at 821 (quoting *Garczynski*, 573 F.3d at 1166).

For a public official to avail himself of qualified immunity, he "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (citations and quotation marks omitted). A government official acts within the scope of his discretionary authority if "the actions were (1) undertaken pursuant to the performance of [his] duties and (2) within the scope of [his] authority." *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995). "The determination that an [official] was acting within his or her discretionary authority is a 'low hurdle' to clear." *Sims ex rel. Sims v. Forehand*, 112 F.Supp.2d 1260, 1267 (M.D. Ala. 2000). If the official satisfies this low hurdle, then the burden shifts to the plaintiff to show that the official violated clearly established constitutional law and that qualified immunity is not appropriate. *Sims*, 112 F.Supp.2d at 1267; *Vinyard*, 311 F.3d at 1346; *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019).

To satisfy his burden to show the violation of a clearly established constitutional right, a plaintiff must prove (1) a *prima facie* case of a constitutional deprivation; and (2) that the right violated was clearly established at the time of the violation. *Trammell v. Thomason*, 335 Fed. Appx. 835, 840 (11th Cir. 2009)

(citing *Saucier*, 533 U.S. at 201); *Corbitt*, 929 F.3d at 1311 (citing *Griffin Indust.,*
*Inc. v. Irvin*, 496 F.3d 1189, 1199-1200 (11th Cir. 2007)). Excessive force claims are
"analyzed under the Fourth Amendment and its 'reasonableness' standard."
*Graham*, 490 U.S. at 395. "For a right to be clearly established, 'the contours of the
right must be sufficiently clear that a reasonable official would understand that
what he is doing violates that right.'" *Corbitt*, 929 F.3d at 1311 (quoting *Anderson*
*v. Creighton*, 483 U.S. 635, 640 (1987)). After all, officials are not obligated "to be
creative or imaginative in drawing analogies from previously decided cases," and a
general "awareness of an abstract right . . . does not equate to knowledge that [an
official's] conduct infringes the right." *Id.* at 1311-12 (quoting *Coffin v. Brandau*,
642 F.3d 999, 1015 (11th Cir. 2011)). "In this circuit, the law can be 'clearly
established' for qualified immunity purposes only by decisions of the U.S. Supreme
Court, Eleventh Circuit Court of Appeals, or the highest court of the state where
the case arose." *Shuford v. Conway*, 666 Fed. Appx. 811, 816-17 (11th Cir. 2016)
(quoting *Jenkins by Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826 n.4 (11th
Cir. 1997)).

### a. Williams and Cooks Were Acting Within the Scope of Their Discretionary Authority

A government official acts within his discretionary authority when he acts
under color of state law: i.e., "with power possessed by virtue of the defendant's
employment with the government entity" as opposed to "acting only as a private
individual." *Bouye v. Marshall*, 102 F.Supp. 2d 1357, 1362 (N.D. Ga. 2000), *aff'd*

*sub nom. Bouye v. Gwinnett Cty.*, 265 F.3d 1063 (11th Cir. 2001); *see Bates v. Harvey*, 518 F.3d 1233, 1242 (11th Cir. 2008).

Each of the Officers clear the low hurdle of showing that each was acting within the scope of his discretionary authority. The Officers each responded to the Premises due to a 911 call from Brianna regarding a perceived home intrusion. The incident leading to Plaintiff's arrest arises from the same nexus of operative events as the 911 call, as the 911 call caused the LPD to dispatch officers, including Williams and Cooks, to the Premises on the night of the arrest. In responding to the 911 call, the Officers were each acting with the authority that comes from being an officer of the LPD and thus were operating within their discretionary authority. The burden therefore shifts to Plaintiff to show that each of Williams and Cooks (1) violated a constitutionally protected right (2) that was clearly established at the time of the violation, neither of which are present in the instant case.

### b. Williams Has Qualified Immunity Against the False Arrest Claim Because He Had Arguable Probable Cause to Arrest Plaintiff

"An officer is entitled to qualified immunity against false-arrest claims if, based on the totality of the circumstances, the officer had arguable probable cause to effectuate the arrest." *Cottam v. City of Wildwood*, 750 Fed. Appx. 791, 793 (Fla. 11th Cir. 2018) (citing *Davis v. Williams*, 451 F.3d 759, 762-63 (11th Cir. 2006)). "Arguable probable cause is a lower standard than actual probable cause, and only requires that, under all of the facts and circumstances, an officer reasonably

could—but not necessarily would—have believed that probable cause was present." *Id.* at 793 (citing *Crosby*, 394 F.3d at 1332).

Thus the question is whether Williams reasonably could have believed that he had probable cause to arrest Plaintiff for either burglary or resisting an officer without violence. The same facts and reasons supporting probable cause, discussed in Section I.a. of this Motion, satisfy the lower standard of arguable probable cause to an even greater degree. Accordingly, Williams has qualified immunity against the false arrest claim and summary judgment is due in Williams's favor thereon.

### c. Neither Officer Violated a Clearly Established, Constitutionally Protected Right, as Neither Officer Used Excessive Force

Both Williams and Cooks are entitled to qualified immunity against Plaintiff's claims of excessive force, both personally and in use of the K-9. For the same reasons stated in Section I.b. of this Motion, the facts of this case simply would not "truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances.*" *Rowe*, 279 F.3d at 1280; *see also* (Ex. 7 at 6). Accordingly, summary judgment is due in the Officers' favor as to Plaintiff's excessive force claims.

### III. The City Is Not Liable for Common Law Battery or False Arrest (Count I)

#### a. Common Law Battery

In Count I of the Amended Complaint, Plaintiff alleges that the City is liable for common law battery because Williams and Cooks "harmfully touched Brandon

Morris without his consent [on] October 27, 2017, inflicting physical force upon him that was excessive under the circumstances." (Doc. 24 ¶¶ 39-40). These allegations are in effect identical to an excessive force claim.

A battery consists of "the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent." *Paul v. Holbrook*, 969 So.2d 1311, 1312 (Fla. 5th DCA 1997). "Under Florida law, where the tort of false arrest is alleged, claims for battery based on acts which are part of the arrest process, such as placing the Plaintiff [in] physical custody, do not give rise to an independent tort but rather are evaluated in calculating Plaintiff's damages." *Clayton v. City of Boynton Beach*, No. 06-80069-CIV, 2007 U.S. Dist. LEXIS 115994 at *5 (S.D. Fla. Mar. 30, 2007) (collecting Florida case law). Where the plaintiff lacks "a factual basis for her battery claim stemming from contact other than those made during her arrest," no claim for battery may lie. *Id.* at *6.

Here, all of the alleged contacts that would constitute a battery—i.e., the use of the K-9 and the use of strikes to obtain compliance during handcuffing, discussed in Section I.b. of this Motion—arose in the due course of Plaintiff's arrest. Thus, no independent action for battery can lie at common law against Lakeland. Additionally, for the exact same reasons explained in Section I.b. of this Motion, the force used was not excessive, and thus cannot constitute an offensive touching sufficient to sustain a claim of battery. Accordingly, summary judgment is due in the City's favor on Plaintiff's state law claim for common law battery.

### b. Common Law False Arrest

Also in Count I of the Complaint, Plaintiff alleges that the City is liable for common law false arrest because Williams and Cooks "effected a warrantless misdemeanor arrest of Brandon Morris on October 27, 2017," without arguable probable cause. (Doc. 24 ¶¶ 37-38). Like the federal law cited above in Section I.a. of this Motion, Florida law also considers probable cause to completely bar an action for false arrest. *Mailly v. Jenne*, 867 So.2d 1250, 1251 (Fla. 4th DCA 2004) (citing *Bolanos v. Metro. Dade Cty.*, 677 So.2d 1005 (Fla. 3d DCA 1996)). As explained in that same Section of this Motion, the undisputed evidence of record shows that the Officers had probable cause to arrest Plaintiff. Thus, Plaintiff cannot maintain his cause of action for common law false arrest against the City, and summary judgment is due in the City's favor thereon.

## CONCLUSION

WHEREFORE, Defendants, CITY OF LAKELAND, FLORIDA; JEREMY WILLIAMS; and ALEXANDER COOKS, respectfully request that this Court enter summary judgment in Defendants' favor and against Plaintiff, BRANDON MORRIS, on all counts of the First Amended Complaint.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 14th day of November, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to:

Matthew Farmer
  400 N. Tampa St., Suite 2840
  Tampa, FL 33602
  mattfarmer1@aol.com
Hubbell C. Losson
  613 South Blvd.
  Tampa, FL  33606
  hubbell.losson@gmail.com
Counsel for Plaintiff

CAMPBELL TROHN
  TAMAYO & ARANDA, P.A.

/s/  Jonathan B. Trohn
JONATHAN B. TROHN
  Florida Bar No. 0880558
  j.trohn@cttalaw.com
  l.hudson@cttalaw.com
  s.strickland@cttalaw.com
EDWARD B. KERR
  Florida Bar No. 1018861
  e.kerr@cttalaw.com
1701 South Florida Avenue
Lakeland, FL  33803
Tel.:  (863) 686-0043
Fax:  (863) 616-1445
Counsel for Defendants